# Compton, *et al. v.* Collins, *et al.*

*Bill to Restrain Foreclosure, for an Accounting and Redemption.*

(Decided November 7, 1914.   Rehearing denied December 17, 1914.
67 South. 395.)

1. *Usury; Definition.*—Usury is the result of a covinous contract entered into by two or more parties, whereby one party is to receive and the other party is to pay for the use of money more than the legal rate of interest.

2. *Same; Credit; Forfeiture of Interest.*—Where money was advanced by one party to another at a usurious rate of interest, the account between the parties should be restated so that no interest should be allowed thereon, and the principal of the account be credited with the payments made by the debtor as they were made.

3. *Same; Equitable Relief; Disallowance of Profit.*—Where the respondents had furnished complainants under a usurious contract, and had charged complainants for mules sold to them, respondents were entitled, upon a restatement of the account, to charge complainants only what respondents had paid for the mules.

4. *Mortgages; Payment of Debt; Rebate Obtained by Mortgagee.*—On a bill for an accounting under a mortgage executed in consideration of a usurious store account against the mortgagor and the payment of his debts, the mortgagee was entitled to charge the amount paid to a creditor in full of the mortgagor's debt with interest thereon; but if the mortgagee misled the mortgagor as to the amount paid or to be paid to the creditor, he was not in a position to take advantage of any profit or rebate allowed him by such creditor.

[Compton, et al. v. Collins, et al.]

5. *Trusts; Mortgagee as Trustee.*—Under a mortgage executed by one financially embarrassed in consideration of his usurious account with the mortgagee, and the assumption by the mortgagee of certain indebtedness, the mortgagee on delivery of the mortgage and notes, became in equity the trustee for the mortgagor of the difference between the principal of the mortgage and the amount of the account; and if, in paying any of the assumed indebtedness, as agent for the mortgagor, the mortgagee made any profit, the mortgagor was entitled thereto as the cestui que trust of such difference.

6. *Same; Attorney's Fees.*—Under a mortgage note providing for an attorney's fee should it become necessary to collect any part of the account by an attorney, the assignee of the mortgage could not charge an attorney's fee for sending an attorney to Virginia to collect, where the mortgagor himself arranged the sale of the land, and the amount could have been collected through the Virginia bank.

7. *Same; Payment; Purchase of Mortgagor; Interest or Equity.*— Where the mortgagor had executed a mortgage on practically all of his estate, consisting of large tracts of land, in consideration of a usurious account against him by the mortgagee and the assumption by the mortgagee of certain debts of the mortgagor, and thereafter the mortgagor by an arrangement with the mortgagee sold his equity or interest in one of the tracts supposed to contain about 2,200 acres, and worth at least $20 per acre, to a clerk in the employ of the mortgagee for about $15 an acre, and when it was afterwards surveyed and found to contain only about 2,000 acres, the mortgagee, who had loaned the purchase money to a clerk, reduced the mortgagor's credit by about $3,000 and credited the clerk with that amount, the clerk, having obtained information as to the mortgagor's financial embarrassment through dealings between the parties, the mortgagee could not be allowed to exact such reduction of credit to the mortgagor, when viewed in the light of the mortgagor's financial condition, his dependency on the mortgagee, and the opportunity for pressure upon him in the transaction.

8. *Usury; Account; Effect.*—Where usurious accounts are brought into a mortgage and consolidated with debts of the mortgagor assumed by the mortgagee, which accounts were not of themselves tainted with usury, the consolidating of accounts so tainted did not render the assumed account usurious.

9. *Same; Transactions; Effective.*—Where part of the usurious accounts carried forward into the account of the succeeding year were not tainted with usury, and were due and collectible on January 1, 1901, they did not become so tainted by being consolidated, and the mortgagee was entitled to legal interest thereon from that date, treated as the first item of the account of that year, and to have payments made or credits applied to the account of that year applied first to that part of the account.

APPEAL from Marengo Chancery Court.

Heard before Hon. THOMAS H. SMITH.

Bill by C. W. Collins and another against J. F. Compton, and the partners composing the firm of Mayer

[Compton, et al. v. Collins, et al.]

Brothers, to restrain the sale of certain land, and for a discovery and an accounting, to relieve the indebtedness of usury, and to redeem from a mortgage. Decree for complainants and respondents appeal. Reversed and remanded.

PETTUS, FULLER & LAPSLEY, BEN F. ELMORE, and HENRY McDANIEL, for appellant.

GEORGE PEGRAM, and ALLEN & BELL, for appellee.

DE GRAFFENRIED, J.—Mr. Charles W. Collins, who is now over 80 years of age, was at one time owner of a plantation consisting of several thousand acres of land and which was situated in the lime lands of Hale county. These lands were fertile and productive of those crops which are accustomed to be grown in what is known as the "Canebrake Section" of Alabama. A good many years ago Mr. Collins found that his extensive farming operations, through the changes which new conditions had created, had heavily involved him in debt, and since that time his history, and the history of his lands, as shown by this record, have been the history of a section which is turning from large ownerships to small ownerships in land; the history, in short, of a section in which the large landowner is being eliminated and the small landowner is taking his place. In his efforts to extricate himself from his financial embarrassments, Mr. Collins began to make sales of parts of his lands, and this policy was pursued until there remains to him something over 1,000 acres. This is, of course, a large tract of land; but its size is modest when compared with his former holdings.

(1, 2) We gather from this record that during the period of his long embarrassment Mr. Collins was forced

to become indebted to many people. Some of these cred-
itors were mortgage companies to which he made mort-
gages on some of his lands; one, at least, of them was
a lady who resided in New York, while some of them
were his immediate neighbors and relatives. During
this period, Mr. Collins began to do business with May-
er Bros., a large mercantile partnership which did bus-
iness at Demopolis, Ala., and which, for the purposes
of this opinion, was composed of two brothers, Mor-
ris Mayer and Ludwig Mayer, and one H. B. Pake.
Morris Mayer and Ludwig Mayer are dead. H. B. Pake
still lives, but he was not, when this bill was filed, a
member of the firm, or in any way interested in it. We
take it from this record that Morris Mayer and Lud-
wig Mayer were, when Mr. Collins opened up the ac-
count with the firm, men who, like Mr. Collins, were of
advanced age, and we also take it that Mr. Collins and
the members of the firm of Mayer Bros. had known each
other for many years. While Mayer Bros. seem to have
been possessed of large means, we gather from the rec-
ord that their business was, essentially, that of mer-
chants, and not that of money lenders. The business
of Mr. Collins was such that he required not only sup-
plies from the store of Mayer Bros., but he also required
some of their cash, and an arrangement was entered
into, when Mr. Collins began to do business with them,
whereby the account of Mr. Collins—and, when we say
"account," we mean "store account"—became tainted
with usury. The chancellor so found upon the evidence,
and in that finding we sustain him. We do this with
full recognition that "usury" is the result of a covinous
contract entered into by two or more parties, whereby
one party is to receive and the other party is to pay,
for the use of money loaned, more than the legal rate
of interest. While we doubt whether Mayer Bros. were

desirous of advancing cash to Mr. Collins at even the usurious rate which they charged him—and which he agreed to pay—nevertheless the contract was made, and we are of the opinion that the chancellor properly held that the account which Mr. Collins had with Mayer Bros. from year to year should be restated, that no interest should be allowed on this account, and that the principal of the account should be credited with the payments which were made by Mr. Collins as they were made.

In this state the usurer is forbidden interest, and the payments made by the debtor are credited upon the principals, both in actions at law and suits in equity, and without regard to who is the actor in the proceedings. This penalty was imposed by the Legislature upon contracts tainted with usury, and it is, of course, the plain duty of the courts to inflict the penalty.

(3) We are not disposed to think, however, that any of the items on the account of Mayer Bros. against Mr. Collins were falsely charged upon the account. On account of the financial embarrassment of Mr. Collins, his account was probably not so attractive to Mayer Bros. as was the account of an unembarrassed customer with unimpaired credit, and, as the opportunity thus presented by Mr. Collins' situation appealed to the cupidity of the members of the firm, an usurious arrangement was the result; but we are not of the opinion that the evidence sustains the argument that Mayer Bros., at any time, charged Mr. Collins on their store account with articles which he did not purchase from or through them. Through usurious contract, Mayer Bros. attempted to make an unlawful—and, under the law, an unconscionable—profit out of Mr. Collins, on the cash advanced to him from their store; but, in our opinion, the articles charged upon the account were in

fact obtained by Mr. Collins. This statement applies to the item of seven mules which appears upon the account. We are satisfied that Mr. Collins obtained from Mayer Bros. the seven mules—not five—and those seven mules should be charged upon the restated account at what Mayer Bros. paid for them. There are items upon the account, to which we make specific reference below, which should not be upon the account; but these items are in the nature of charges for interest or attorneys' fees, and are not charges for merchandise or property which Mr. Collins did not obtain from Mayer Bros. In so far as the store account is concerned, the items charged thereon as having been sold to Mr. Collins were, in all human probability, obtained by him. While there may never have been a technical statement of the account between Mayer Bros. and Mr. Collins, statements were from time to time rendered to him, and we are not inclined to think that items appeared upon those statements as representing things sold to Mr. Collins unless they were in fact sold to him. An error may have inadvertently crept into the statement, but we hardly think that an error so great as the value of two mules could have crept into the account.

1. After Mr. Collins had thus been dealing with Mayer Bros. for several years, his financial situation and pressure from creditors indicated to him the necessity of, so far as possible, consolidating his indebtedness and of arranging a long loan. To this end he employed an attorney to negotiate for him a loan for a large amount for a period of five years, the loan to be secured by a mortgage on his Alabama lands. Efforts were made to secure this money from some corporation engaged in the business of lending money, but these efforts were unsuccessful. Finally, Mayer Bros. agreed to lend Mr. Collins $24,956.43 on five years' time,

[Compton, et al. v. Collins, et al.]

with interest at the rate of 8 per cent. per annum. To this end a mortgage was executed and delivered by Mr. Collins and his wife to Mayer Bros. This mortgage covered all, or substantially all, of the real estate of Mr. Collins in Alabama, and secured the following notes, viz.: An interest note of $1,868.96, due December 1, 1904. Three interest notes of $1,966.51, due, respectively, on December 1, 1905, 1906, and 1907. And one note for $26,852.94, being for the principal, $24,-956.43, and $1,966.51 interest, due December 1, 1908. The papers all bear date December 28, 1903, and the interest represented by the above notes on $24,956.43 is 8 per cent. per annum.

The principal of $24,956.43, of the above indebtedness, represented the following items: $2,200 claimed to have been paid to Davies & Bro. $2,600 claimed to have been paid to one Gage. $902.47 claimed to have been paid to one Metzger. $2,332 claimed to have been paid to one Marx. $1,102.21 claimed to have been paid to Davies & Bro. $660 claimed to have been paid to one Gilder. $500 claimed to have been paid to one Gilder. $751.81 claimed to have been paid to one Nelson. $878 claimed to have been paid to one Ernst. $1,465.75 claimed to have been paid to R. H. & W. C. Agee. $344.31 claimed to have been paid on a judgment. The balance of the $24,956.43, viz., about $1,219.88, was represented by the balance claimed by Mayer Bros. to be due them by Mr. Collins on his account with them, including usurious interest which had been charged to him by them and possibly one or two items which are not above enumerated as having been paid out by Mayer Bros. when this mortgage was made.

(4) 2. The item of $2,200, to which we have above referred, claimed to have been paid Davies & Bro., was not paid to them on the day the mortgage was made.

It was Mr. Collins' understanding either that it had been paid or that it would be paid in full. Some time later, however, Mayer Bros. paid to Davies & Bro. the sum of $2,250 in full of said debt. In our opinion Mr. Collins is chargeable with that $2,250 from the date of its payment and interest thereon at the rate of 8 per cent. per annum.

The members of the firm of Davies & Bro. were related to Mr. Collins, and if Mayer Bros. misled him as to the amount which they paid Davies & Bro.—or would in the future pay them—they are not in a position to take advantage of the rebate which they obtained from Davies & Bro.

(5) When Mr. Collins executed the notes and mortgage to which we have above referred, and delivered them to Mayer Bros., they became, in equity, his trustees of a fund which amounted to the difference between the principal of $24,956.43, and the amount of their usurious account, and if, in paying any of the debts above referred to—they represent the debts which Mayer Bros. claim to have canceled with said sum—Mayer Bros. made any profit, then, ex æquo et bono, Mr. Collins, the cestui que trust of the fund, is entitled to the rebate. After the execution and delivery of the notes and mortgage, the sum left in Mayer Bros.' hands, over and above their account, was a sum in their hands which belonged to Mr. Collins and not to Mayer Bros. In paying off the above scheduled debts, Mayer Bros. were representing, not themselves, but Mr. Collins.

(6) 3. Under the evidence in this case, we think that the chancellor correctly found that Mr. Collins is not chargeable with the item of $660 paid to Mr. E. J. Gilder. Mr. Collins perfected a sale of certain lands in the state of Virginia. Upon these lands Mr. Collins had made a mortgage to Mrs. Rachel Mayer, of New York,

[Compton, et al. v. Collins, et al.]

which had been assigned to Mayer Bros. . After this sale
of the Virginia lands had been arranged by Mr. Col-
lins, Mayer Bros. saw proper to send Judge Gilder, who
was then a practicing attorney, to Virginia, to collect
the money due on the Rachel Mayer mortgage and to
release the lands from the mortgage. The note which
was secured by the Rachel Mayer mortgage provides for
the payment of an attorney's fee if it becomes neces-
sary to employ an attorney to collect the amount due
on it, and the mortgage provides for the payment of
an attorney's fee in the event of a sale of the lands de-
scribed in the mortgage, under the power of sale con-
tained in the mortgage. There was no sale of the lands
under the power contained in the mortgage, and Mayer
Bros. were under no necessity to send an attorney to
Virginia to collect their money out of the proceeds of
the sale of the Virginia lands. It is evident that, as
Mr. Collins himself arranged a sale of the Virginia
lands, this collection could have been made through
the medium of a bank in Virginia, and that Mr. Col-
lins should not be required to pay the fee of an attor-
ney employed by Mayer Bros., under the circumstances
named. At the time of the employment of this attorney,
Mr. Collins, with all of his property wrapped up in
mortgages and covered by liens, was struggling to meet
the just demands of his creditors, and while Mayer
Bros. had the right, if they saw proper, under the cir-
cumstances named, to indulge in the luxury of sending
an attorney to Virginia—and we do not question the
fact that he earned his fee—they had no right, even
under the letter of their bond, to employ one to go to
Virginia at the expense of Mr. Collins. While we do
not believe that this employment of an attorney grew
out of any desire on the part of Mayer Bros. to in-
flict useless punishment upon Mr. Collins, it did grow

out of a not well-grounded fear that something might happen to the proceeds of the sale of the Virginia lands if Mayer Bros. were not there on the spot when the sale was consummated. In other words, the employment of an attorney grew out of a lack of proper business trust on the part of Mayer Bros., and for the result of this not well-founded business timidity Mr. Collins should not be required to pay.

4. There appears on the account of Mayer Bros. with Mr. Collins credited, as of November 8, 1901, a mortgage for $2,000, and on December 4, 1901, he is charged with, "To cash from bills receivable," $2,000. We are satisfied from the evidence that the truth of this matter is that these two items refer to the same thing, and that they offset each other. We are not of the opinion that Mayer Bros. intended to be dishonest with Mr. Collins, and we think that the testimony of Mr. Bley furnishes a reasonable and truthful explanation of this debt and credit. Mr. Bley testified, in substance, that Mr. Collins made this mortgage for the purpose of raising a sum of money to pay certain pressing debts. These debts amounted, it was thought, to $2,000; but in reality they were, after the papers were executed and delivered, ascertained to be only $1,750. Mayer Bros. paid these debts, and they appear as items on the account. The account had been credited with the mortgage for $2,000, and, to make the books speak the exact truth, the mortgage was charged back on the account, thus leaving the debt of Mr. Collins at what it really was, viz., $1,750.

5. Mayer Bros., we think, with the approval of Mr. Collins, and at his request, paid to the attorneys of Metzger the sum of $902.47, which we have listed above. This sum includes an attorney's fee and a large advertising bill; but Mayer Bros. had no interest in this mat-

ter, and we are satisfied that they not only paid that money, but that there was no usury in that transaction. The evidence also satisfied us that the sums which we have above set out as having been paid to Gage, Marx, Nelson, Ernst, R. H. & W. C. Agee, $1,102.21 judgment to Davies & Bro., and the $344.31 noted as having been paid on a judgment, were in fact paid, and that there is no usury in any of those transactions. There is no dispute between the parties as to the correctness of the item of $500 paid to Judge E. J. Gilder as a fee for preparing the papers evidencing the loan of $24,956.43.

6. We agree with the chancellor in his finding that Mr. Compton, who bought the mortgage for $24,956.43 from Mayer Bros., is not in a position to claim that Mr. Collins is estopped from setting up usury in his transactions with Mayer Bros. We make this announcement without going into the reasons for this conclusion after a careful examination of all the evidence in the case, and a discussion of the subject would simply involve a discussion of the evidence. The parties to the cause are familiar with the evidence, and a mere discussion of it at our hands would serve no useful purpose.

(7) 7. On March 4, 1908, a sale of what is known as the Manning Place was arranged by joint agreement of Mayer Bros. and Mr. Collins, to James F. Compton. The Manning Place was supposed to contain 2,200 acres of land. It originally belonged to a tract of about 4,000 acres, which was bisected by Big Prairie creek. The lands lying north of this creek, several years before this time, had been sold to Ivey F. Lewis, and some part of the land had been sold to B. M. Allen. The land conveyed to Compton comprised the lands situated in certain sections bounded on the north by Big Prairie creek and on the south by the Prairieville and Laneville

Road. The evidence all shows that the Manning Place was a well-known and reasonably well-defined plantation, and we think that the evidence shows beyond controversy that at the time of this conveyance to Compton the lands were worth at a minimum not less than $20 per acre. In discussing this matter, we shall treat this purchase of the Manning Place as if it had been made by Mayer Bros. direct. Compton was a clerk in the employ of Mayer Bros., and he not only knew all about this matter, but he also knew all about the state of the account of Mayer Bros. with Mr. Collins; and we are also quite satisfied that he must have known all about the financial situation of Mr. Collins. Indeed, through his deals with Mayer Bros. and Mr. Collins, he finally became possesser of Mayer Bros.' indebtedness against Mr. Collins, and also of the Manning Place, representing, in all, an investment by Compton of something like $50,000. If the purchase of the indebtedness of Mayer Bros. against Mr. Collins and the Manning Place by Mr. Compton, were made by him for his sole benefit—if, in such purchase, he was not, in fact, Mayer Bros.—then Mr. Compton made this purchase of the indebtedness of Mayer Bros. and the Manning Place because he saw an inviting field in which to engage his attention and from which, as a business man, he could safely look for large returns. Undoubtedly, when this sale of the Manning Place was arranged, Mayer Bros. had been led, by their dealings from year to year with Mr. Collins, into arrangements which had locked up a large part of their capital in securities which were probably giving them grave concern, and which, from the standpoint of merchants who need quick assets, were not desirable; and we think that the record shows that, when the Manning Place was sold, Mayer Bros. had become timid of their dealings with

[Compton, et al. v. Collins, et al.]

Mr. Collins and were anxious to change at least the form of a large part of his indebtedness. If Mr. Compton made the purchase to which we have above referred —and we raise no point on that matter, and accept the statement that he did make the purchase for his own personal benefit as the truth—he bought the Manning Place under such circumstances as placed him in Mayer Bros.' shoes, and that purchase must carry with it the same burdens as if Mr. Collins had conveyed his equity of redemption in the Manning Place direct to Mayer Bros. While Mr. Compton was not a member of the firm of Mayer Bros., he was in their active employ, and in this matter he became the beneficiary of the sale of a valuable plantation which was brought about by pressure from the firm of which he was an employee. The business precautions and fears of Mayer Bros., and not a wanton desire or intent to oppress, may have produced the pressure, but the pressure was there, and it is the business of courts of equity, when oppression, no matter from what cause it may arise, is shown, to see to it that no undue advantage is derived thereby. Courts of equity are watchful of releases by mortgagors to mortgagees, of their equities of redemption in lands, and, when there is a sale at a consideration which would be deemed unreasonable if the transaction were between other parties dealing with similar property in the vicinity, such a sale will not be upheld. In this case there was "power on one side and weakness on the other," and in our opinion the chancellor properly held that the account of Mayer Bros. should remain credited with the $35,000, the amount with which it was originally credited, as the price of the Manning Place.—*Goree v. Clements*, 94 Ala. 337, 10 South. 906; *Stoutz v. Rouse*, 84 Ala. 309, 4 South. 170. When, through Mayer Bros., the sale of

the Manning Place was effected, the place was supposed to contain 2,200 acres. 'Mr. Collins wanted $35,000 for his Manning Place, and $35,000 divided by 2,200 (acres) gives $15.91 per acre. When the price was agreed up, it was in writing, signed by Mayer Bros., Mr. Compton, and Mr. Collins agreed that the purchase price was $15.91 per acre, and the writing continues as follows: "In consideration of the purchase of what is known as the Manning Place in Hale county, Alabama, supposed to contain twenty-two hundred (2,200) acres, by Jas. F. Compton, from C. W. Collins at and for the price of $15.91 per acre, as soon as a survey of said plantation is had and the number of acres ascertained, Mayer Bros. agrees to release and discharge from their mortgage executed to them by C. W. Collins, said real estate upon a settlement to be then had with said Compton and to credit the indebtedness and mortgage of said C. W. Collins with the purchase price of said real estate when the acreage is ascertained, at $15.91 per acre. The said C. W. Collins agrees and covenants to sell and does hereby sell said Manning plantation supposed to contain twenty-two hundred (2,200) acres to said Compton at the purchase price of $15.91 per acre, and said J. F. Compton agrees and covenants to settle and pay for said land at and for said sum of $15.91 per acre."

When the above agreement was made, a conveyance from C. W. Collins and wife to James F. Compton, reciting a consideration of $35,000 for the Manning Place, was prepared, and was signed and delivered by Mr. Collins to Mr. Compton. Thereupon Compton was placed in possession of the Manning Place and became its owner. Without making a survey as contemplated in the above agreement, Mr. Compton, according to the testimony, paid to Mayer Bros. $5,000 on the purchase of the Manning Place and executed to them his notes se-

cured by mortgage on the Manning Place for the balance of the purchase money. Something like a year after the above transaction had thus been apparently closed, Mayer Bros. or Mr. Compton had the Manning Place surveyed, and ascertained that it contained, not 2,200 acres, but about 2,000 acres. There was therefore some disappointment as to the acreage. Thereupon, through pressure from Mayer Bros. who still held mortgages on substantially all of Mr. Collins' property, and who, on that account, were the only people to whom Mr. Collins could look for financial assistance, Mr. Collins was induced to agree to an abatement of the purchase money of the Manning Place to the extent of $3,-336. Thereupon Mayer Bros. charged Mr. Collins with this $3,336, and credited the same amount upon the debt of Compton to them. When Mr. Compton, through the efforts of Mayer Bros. obtained the Manning Place at $35,000, he received a plantation which, upon a most conservative valuation, was well worth every dollar that he agreed to pay for it, and, were this court to uphold this reduction, it would, under the great weight of the testimony as to the value of the Manning Place, overturn the doctrines which were announced by this court in *Goree v. Clements, supra,* and *Stoutz v. Rouse, supra.* Mr. Collins was in no position to resist the demands of Mayer Bros. and while we do not believe that they, in their dealings with Mr. Collins, were actuated by dishonest motives, we do think that, under all of the testimony, they were not mindful, in making their trades with him, of the power which their position gave them over a man who was largely in their debt and who was faced with the constant necessity of providing methods of extending debts which he was unable to meet but which he was struggling to pay. In other words, Mayer Bros. being merchants, were traders, and this was one

trade which, on account of their commanding influence over Mr. Collins, they had not, in equity, the right to make. To uphold this reduction would result in upholding a bargain which, under all the evidence as we read it, Mayer Bros. were in no position to exact.— *Goree v. Clements, supra.*

8. That the store account of Mayer Bros. against Mr. Collins is tainted with usury is established by the case of *Meyer Bros. v. Cook,* 85 Ala. 417, 5 South. 147. In that case there was an agreement to pay more than the lawful rate of interest, and we think the same character of agreement pervades the account of Mayer Bros. against Mr. Collins.

(8) 9. The fact that this usurious account was, when the mortgage for $24,956.43 as executed, brought into that mortgage and consolidated with debts not tainted with usury, does not render the debts not tainted with usury and which were brought into that mortgage usurious.—*Smith v. Neely,* 2 Ind. T. 651, 53 S. W. 451; *Eslava v. Crampton,* 61 Ala. 507; *Nobles v. Moses,* 74 Ala. 604.

10. The record in this case is extremely voluminous, and in this opinion we have, after a careful examination of the record, undertaken to express our views as to each question which has been presented to us. We presume that the views above expressed will furnish the chancellor with a sufficient guide during the further progress of the cause.

Reversed and remanded.

ANDERSON, C. J., and McCLELLAN and MAYFIELD, JJ., concur.

ON APPLICATION FOR REHEARING.

(9) On this application for a rehearing our attention is called to the fact that no usurious interest was charged by Mayer Bros. to Mr. Collins in their store account for the year 1900. The usury appears in the store accounts for the years subsequent to the year 1900. There was a balance of $3,859.61 carried forward from the above account of 1900 into the store account of 1901. This balance was not tainted with usury, and was due and collectible on January 1, 1901. The fact that it was carried forward into the account of 1901 does not subject that item to the taint of usury. This conclusion is shown by the above opinion and is sustained by the following authorities cited in the above opinion, viz.: *Smith v. Neeley,* 2 Ind. T. 651, 53 S. W. 451; *Eslava v. Crampton,* 61 Ala. 507; *Noble v. Moses,* 74 Ala. 604. It is our conclusion that, under the evidence contained in this record, Mayer Bros. are entitled to interest on this balance of $3,859.61 from January 1, 1901, until by payments made subsequent to that date, this balance was satisfied. This item of $3,-859.61 should be treated as the first item of the account of 1901, and the payments made or credits applied to the account of 1901 should be first applied to this particular item until that item is fully paid and satisfied. In this particular and in this particular only, the above opinion is modfied.

The court is of the opinion that the appellee should be taxed with all of the costs of this appeal.

Opinion modified, and application for rehearing overruled.

ANDERSON, C. J., and McCLELLAN and MAYFIELD, JJ., concur.